Filed 7/7/21  P. v. Storrs CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C087437 |
| Plaintiff and Respondent, | (Super. Ct. No. STKCRFE20160015254) |
| v. | |
| KENNETH EUGENE STORRS, | |
| Defendant and Appellant. | |

The victim was standing in a recycling center in Stockton, having agreed to help E.S. redeem his recycling.  While the victim was helping E.S., defendant stabbed the victim.  Defendant inflicted two superficial incised wounds in the neck area and two fatal stab wounds penetrating from the neck area into the chest cavity, killing the victim.  A jury found defendant guilty of first degree murder and found true an allegation alleging a sentence enhancement that, in committing the murder, defendant personally used a deadly or dangerous weapon.

1

On appeal, defendant's only contention is that the evidence was legally insufficient to prove premeditation and deliberation so as to support the jury's first degree murder verdict. He asserts his conviction should be reversed or reduced to murder in the second degree.

We affirm the judgment.

## FACTS AND HISTORY OF THE PROCEEDINGS

Defendant was charged in an information with the murder of the victim (Pen. Code, § 187, subd. (a) [statutory section references that follow are to the Penal Code unless otherwise stated]; count 1) and criminal threats against E.S. (§ 422, subd. (a); count 2). In connection with each count, the information alleged defendant personally used a deadly or dangerous weapon within the meaning of section 12022, subdivision (b)(1), and that he had sustained two prior serious felony convictions within the meaning of sections 1170.12, subdivision (b), and 667, subdivision (d).

The Prosecution Evidence

On November 10, 2016, at approximately 4:15 p.m., the victim and his uncle went to the recycling center on Worth Street in Stockton. When they arrived, the victim's uncle retrieved baskets to transport his recyclables. He then went inside and stood in line. Usually, when they went to the recycling center, the victim would wait in his car.

E.S. was also at the recycling center. However, he did not have a California identification card, which is required to redeem certain types of recyclables. E.S. looked around for someone with a California identification card. E.S. found the victim sitting in his white Mercedes and the victim agreed to help E.S. E.S. told the victim he would call him inside when it was his turn.

E.S. went inside and waited in line. He noticed defendant staring at him like he wanted to say something. E.S. asked defendant if there was something on his mind, but

defendant did not answer him. When it was his turn, E.S. motioned for the victim to come in.

The victim's uncle was inside the recycling center approximately three to four minutes. He received his money and a receipt. As he was walking out of the recycling center, the victim said to him, " 'Uncle, I'm going to turn this in for this guy real quick, turn this recycling in.' " The victim's uncle left the warehouse and took a couple of steps when he turned around. He saw that the victim and defendant were "[s]ide to side," with defendant to the victim's left in the doorway. At that point, the victim's uncle dropped his receipt and it "ended up under [defendant's] foot." The victim's uncle said, "[e]xcuse me" and retrieved the receipt. The victim's uncle did not exchange any additional words with defendant and he did not see any interaction between defendant and the victim.

The victim's uncle decided to go back to the recycling center desk and get a couple of sodas, one for him and one for the victim. The victim's uncle walked into the recycling center and went several steps toward the desk. At this point, the victim and defendant were behind him.

E.S. asked the victim to hand his recyclables to him at the scales, and the victim gave E.S. two of the barrels. E.S. "turned back around to grab the other ones and [the victim] had already been stabbed." Blood "was gushing from his shoulder . . . ." E.S. did not see the stabbing and did not see anyone around him at the time.

The victim's uncle heard one of the workers say, " 'Get the F out of here.' " At that point, the victim's uncle turned around and saw the victim walking towards him. The victim was holding his neck, and he said, " 'Uncle, he cut me.' " The victim took his hand down and "blood squirted in the air, squirted about ten feet in the air maybe twice." The victim's uncle had the victim sit down in a chair near the desk. The victim's uncle "told [the victim] he was going to be okay, but he wasn't." E.S. tried to stop the bleeding by putting "enormous amounts of pressure" on the victim's neck. The victim never said anything else.

3

E.S. again observed defendant looking at him. Defendant told E.S., " 'You're next,' " and " 'I'll be waiting for you outside out here.' " According to the victim's uncle, defendant was yelling something like, " 'you guys going get it [*sic*] next.' " He was threatening in the direction of the victim's uncle and others, and the victim's uncle did not know whom defendant was threatening. Defendant, mad and angry, walked outside and into the street.

Neither the victim's uncle nor E.S. saw defendant with a weapon. Another witness, G.S., who also tried to help the victim, remembered seeing that defendant was wearing blue rubber gloves.

The victim's uncle testified he had seen defendant at the recycling center "quite often," and he believed defendant's grandfather "used to stay next door to me." However, the victim's uncle did not have any prior problems or negative interactions with defendant.

R.L. worked at the recycling center. He was standing by scales in the recycling center when he heard a sound like a woman's scream. R.L. then saw the victim bleeding. He also saw defendant "turning around and taking off in the opposite direction out the gate." R.L. testified that he told police he had seen someone "creeping." After the fact, R.L. realized it was defendant he had seen creeping. R.L. testified that, after the fact, he pieced things together and realized who he had seen creeping. By "creeping," R.L. meant defendant was "[c]rouching down, like crouching down, walking towards somebody." R.L. observed defendant creeping with his peripheral vision. He observed movement from the doorway towards where the victim was standing. After R.L. heard the scream, he noticed defendant "trotting backwards" outside and to the gate.

P.O., the manager of the recycling center was at work behind the counter. He went to get something for a customer and, when he returned, he saw the victim had been stabbed in the neck. The victim was holding his neck. When the victim let go of his neck, "a fountain of blood just poured out of his neck." P.O. did not see the stabbing.

4

The victim went to a chair. A second or two after he saw the victim, and near where he had seen the victim, P.O. saw defendant coming from the same direction the victim came from. Defendant "was waving a knife around . . . . He was just in the air, like filleting something." The blade was six to eight inches long. Defendant pointed the knife in "the direction of the guy that got stabbed and then he pointed it back at" P.O. P.O. did not hear defendant say anything. Defendant just kept gesturing, pointing to everyone with whom he made eye contact. Defendant then "just turned around and walked away." P.O. called 911.

P.O. testified he had seen defendant before, every day. According to P.O., "he's one of the -- the neighborhood people that lives around there." P.O. also testified that people use pocketknives or tools at the recycling center all the time for utility purposes.

Stockton Police Officer Paul Billman and his partner responded to the recycling center. Billman saw the victim, sitting in a chair, bleeding heavily from the left side of his neck. There was a large pool of blood on the ground. Another individual was holding pressure on the victim's neck. Eventually, paramedics arrived and took the victim to the hospital.

Detective Joseph Bitondo arrived at the recycling center at approximately 5:40 p.m. Bitondo went to an encampment across the street from the recycling center. At some point, he saw defendant walking towards the encampment. Defendant said it was his encampment. Police conducted a showup with P.O. Bitondo detained defendant and took him to the police station. Bitondo measured the left rear pocket of plaid shorts defendant had been wearing. Depending on orientation, straight up-and-down versus diagonal, the pocket measured between six and seven inches deep.

Inside the recycling center, police found a folding knife. The blade was approximately two and a half inches long.

Bitondo reviewed the surveillance video that was played for the jury. The recording did not have a time stamp. Bitondo determined the timing of events based on

5

when the police arrived. The victim and his uncle arrived at the recycling center approximately 24 minutes before police arrived. Twelve minutes before the police arrived, the victim was in his white Mercedes while defendant walked across a part of the parking lot. Defendant arrived at the recycling center approximately eight minutes before the police arrived. Defendant could be seen standing behind the victim approximately seven minutes before the police arrived. Five minutes before the police arrived, the victim can be seen walking inside the recycling center building. Three minutes before police arrived, defendant can be seen leaving the premises.

Dr. Arnold Josselson testified as an expert in the field of forensic pathology. Josselson performed the autopsy on the victim. The victim sustained four "sharp force injuries." Josselson testified there are two types of sharp force injuries: stab wounds, which are deeper than they are long on the surface of the skin, and incised wounds what are longer on the surface of the skin than they are deep. The victim sustained an incised wound on the upper left side of his chest, "a very superficial wound." He sustained a second wound, a stab wound to the left shoulder, about two and a half inches below the top of the shoulder, that went into the chest cavity. This wound, which was fatal, was seven inches deep. As a result of this wound, the victim suffered bleeding into the chest cavity. According to Josselson, "[u]nless the bleeding is stopped, a person will bleed out, which is what happened to" the victim. A third wound was a nonfatal wound to the left shoulder which was very superficial. Finally, a fourth wound, another fatal wound, was inflicted to the top of the back on the left side and into the left chest cavity. This wound severed the victim's subclavian artery, a "rather big artery" that runs under the clavicle. This wound was six inches deep. Based on the wounds, Josselson estimated that the knife that inflicted them would have been anywhere from "a little less than six inches" long to quite a bit longer. Other than the "sharp force injuries" and trauma from resuscitation, the victim did not sustain any other injuries. The victim did not sustain any injuries to his hands, wrists, or face. The two fatal stab wounds entering the left chest

6

were the causes of the victim's death. Josselson testified that, without resuscitation, the victim would have lost consciousness within five minutes and died within five to 10 minutes.

A DNA sample taken from the blade of the folding knife was a mixture of at least two individuals, and included a major and minor contributor. The major contributor was consistent with the victim's DNA profile. Defendant was excluded as the major contributor. The data for the minor contributor was insufficient to analyze. On the handle of the folding knife, there was only one DNA profile found, which was consistent with the victim's profile. Defendant was eliminated as a source of the DNA on the handle of the knife.

The defense presented no evidence.

Verdict and Sentence

The jury found defendant guilty of murder in the first degree. The jury further found that, in committing the murder, defendant personally used a weapon, a knife, within the meaning of section 12022, subdivision (b)(1). The jury found defendant not guilty of criminal threats.

In a bifurcated proceeding, the trial court found true the allegations defendant sustained two prior serious felony convictions.

The trial court sentenced defendant to 76 years to life, calculated as follows: 25 years to life on count 1, murder, tripled pursuant to sections 1170.12, subdivision (c)(2)(A), and 667, subdivision (e)(2)(A), plus one year on the personal use of a deadly or dangerous weapon enhancement pursuant to section 12022, subdivision (b)(1).

## DISCUSSION

Defendant contends his conviction of first degree murder must be reversed or reduced to second degree murder because the evidence was legally insufficient to prove premeditation and deliberation. Defendant emphasizes the proof of premeditation was

7

wholly circumstantial. Defendant asserts that, analyzing the evidence in the context of the framework set forth by our high court in *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), his "conviction for premediated and deliberate murder cannot be sustained." The Attorney General counters that evidence defendant "stalked and stabbed an unsuspecting [victim] was substantial evidence of premeditation and deliberation."

"The law governing sufficiency-of-the-evidence challenges is well established . . . . [Citations.] In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. [Citation.] If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 638-639 (*Jennings*).)

"The same standard of review applies to cases in which the prosecution relies mainly on circumstantial evidence . . . ." (*People v. Maury* (2003) 30 Cal.4th 342, 396 (*Maury*), disapproved on another ground in *Barnett v. Superior Court* (2010) 50 Cal.4th 890, 901.) "An appellate court must accept logical inferences that the jury might have drawn from the circumstantial evidence." (*Maury*, at p. 396; see also *People v. Bloom* (1989) 48 Cal.3d 1194, 1208 (*Bloom*) ["Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction"].)

" 'A reversal for insufficient evidence "is unwarranted unless it appears 'that upon *no hypothesis whatever* is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142 (*Penunuri*), italics added.)

" 'Murder is the unlawful killing of a human being . . . with malice aforethought.' [Citation.] Malice aforethought may be express or implied." (*People v. Elmore* (2014) 59 Cal.4th 121, 132.) "A killing with express malice formed willfully, deliberately, and with premeditation constitutes first degree murder." (*People v. Beltran* (2013) 56 Cal.4th 935, 942 (*Beltran*).) " 'Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' " (*Ibid*.)

"The very definition of 'premeditation' encompasses the idea that a defendant thought about or considered the act beforehand. ' " '[P]remeditation' means thought over in advance," ' and ' " '[d]eliberation' refers to careful weighing of considerations in forming a course of action . . . ." ' [Citations.] 'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' " (*People v. Pearson* (2013) 56 Cal.4th 393, 443.) " ' " 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' " ' " (*People v. Casares* (2016) 62 Cal.4th 808, 824 (*Casares*), disapproved on another ground in *People v. Dalton* (2019) 7 Cal.5th 166, 214.)

In *Anderson, supra*, 70 Cal.2d 15, our high court stated: "The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing -- what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with

9

the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2). [¶] Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*Id*. at pp. 26-27.)

As our high court has since cautioned, however, " ' "[u]nreflective reliance on *Anderson* for a definition of premeditation is inappropriate. The *Anderson* analysis was intended as a *framework* to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations. It did not refashion the elements of first degree murder or alter the substantive law of murder in any way." [Citation.] In other words, the *Anderson guidelines* are descriptive, not normative.' " (*Casares, supra*, 62 Cal.4th at p. 824, quoting *People v. Koontz* (2002) 27 Cal.4th 1041, 1081, italics added; see *People v. Sandoval* (2015) 62 Cal.4th 394, 424.) Put another way, the *Anderson* guidelines are not exhaustive, and "reviewing courts need not accord them any particular weight." (*Sandoval*, at p. 424; *People v. Halvorsen* (2007) 42 Cal.4th 379, 420.) In addition to referring to planning, motive and manner of killing as guidelines and collectively as a framework, our high court has also characterized those factors for consideration as an " '*aid* [for] reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of

10

considerations rather than mere unconsidered or rash impulse.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 59, italics added.)

Discussing the evidence in context of the framework set forth by our high court in *Anderson*, defendant argues there "does not appear to be any evidence" of planning activity. We disagree. Defendant was obviously armed with a knife. The knife blade, according to Dr. Josselson, was anywhere from "a little less than six inches" long to quite a bit longer. The left rear pocket of the shorts defendant was wearing measured six to seven inches deep. He was apparently living in an encampment across the street from the recycling center. True, there does not appear to be direct evidence establishing defendant brought the knife with him from outside of the recycling center. However, defendant acknowledges he "brought a knife to the recycling center," and "had a knife in his pocket and wore gloves." Additionally, there is no evidence defendant found a knife with a blade six inches long or longer in the recycling center and armed himself with it.

"We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. [Citation.] If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Jennings, supra*, 50 Cal.4th at pp. 638-639.) Moreover, "[a]n appellate court must accept logical inferences that the jury might have drawn from the circumstantial evidence." (*Maury, supra*, 30 Cal.4th at p. 396; see also *Bloom, supra*, 48 Cal.3d at p. 1208 ["Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction"].) Based on all the foregoing, the jury reasonably could have inferred defendant armed himself with the knife and concealed it in his pocket before leaving his encampment for the recycling center. While this does not, in itself, suggest defendant was planning to kill this victim at the recycling center that day, it does establish that he planned to arm himself with a knife to accomplish whatever might have come about while he was there.

According to R.L., he saw defendant "creeping" around at the time of the stabbing. By "creeping," R.L. meant defendant was "[c]rouching down, like crouching down, walking towards somebody." R.L. observed movement from the doorway towards where the victim was standing. Defendant creeping up on his victim strongly supports the conclusion that he was planning the killing, and that the killing was premeditated and deliberate.

According to G.S., defendant was wearing blue rubber gloves. This, too, suggests planning and premeditation.

The Attorney General also raises the "unprovoked and surprise nature" of defendant's attack on the victim as "further demonstrate[ing] planning." We agree that the absence of any clear evidence of a heated exchange between defendant and the victim suggests it was not a sudden, violent outburst. A reasonable jury could infer that, in the absence of any such exchange, defendant's actions were planned. Additionally, from the absence of injuries to the victim's hands and wrists, a reasonable jury could infer defendant's attack was not the result of a heated confrontation between the victim and defendant, but instead a planned surprise attack on the victim.

Turning to the second consideration, defendant asserts there was no evidence of any motive. On this record, we agree. There is no evidence in the trial record establishing any sort of relationship between defendant and the victim or any reason for the attack.

As to the manner of killing, defendant acknowledges that "the manner of killing -- deep stab wounds which severed the subclavian artery -- indicates a clear intention to kill . . . ." However, he further asserts this manner of killing was "certainly not so 'particular and exacting' that it tends to prove that the defendant had a preconceived design to take his victim's life in a particular way, so as to indicate premeditation rather than an impulsive or explosive killing."

12

We conclude, however, that the manner of the killing readily supports the conclusion that the killing was deliberate and premeditated. The evidence established defendant stabbed the victim in the left shoulder and neck area into the victim's chest cavity. This seven-inch-deep wound was fatal, causing the victim to bleed out. Defendant also stabbed the victim on the top of the back on the left side and into the left chest cavity. This wound, which was also fatal, severed the victim's subclavian artery, a "rather big artery" that runs under the clavicle. This wound was six inches deep. These two fatal stab wounds were obviously to vital and vulnerable areas. Additionally, the victim sustained two minor knife wounds to the same area. The victim had no defensive wounds to his hands and wrists further suggesting that defendant intentionally snuck up on the victim in a stealthy way intended to take the victim by surprise. This is strong evidence not only of planning, but also of premeditation as defendant was approaching his victim.

These facts bore directly on, and supported the conclusion that, defendant acted with premeditation and deliberation. (See *People v. Morales* (2020) 10 Cal.5th 76, 102 [the trial evidence showed, among other things, that the defendant delivered the fatal wound to one victim's neck from behind, and in a manner that resulted in no defensive wounds, and other evidence established the adult victims suffered multiple fatal stab wounds to the neck or chest; these facts bore directly on whether the defendant acted with premeditation and deliberation]; see also *People v. Booker* (2011) 51 Cal.4th 141, 152, 173 [Corina suffered multiple "sharp force injuries" to the neck and bled to death because her right carotid artery and jugular vein were severed; although the defendant claimed he only "nicked" her, the wounds on her throat indicate she was killed deliberately]; *People v. Harris* (2008) 43 Cal.4th 1269, 1287 [the defendant was armed with a knife and stabbed the victim without provocation directly in the heart with enough force to penetrate part of a rib and pierce entirely through the heart, and, in the time it took for the victim's daughter to go from the door to the service window, and to take and prepare the

13

defendant's order, there was ample time for him to deliberate and premeditate before attacking the victim; under these circumstances, we cannot say the jury could not reasonably have found the defendant guilty of first degree murder].)

A stab wound to a vital area such as the neck " 'is indicative of a reasoned decision to kill.' " (*People v. Lewis* (2009) 46 Cal.4th 1255, 1293 [even if initial strangulation was spontaneous, the additional act of slashing victim's throat is indicative of a reasoned decision to kill].)

The fact that defendant inflicted on the victim two stab wounds to the neck (as well as two incised wounds to the neck) with an implied interval to reflect supports the conclusion defendant killed in an intentional and deliberate manner. (*People v. Williams* (2018) 23 Cal.App.5th 396, 410 [there is evidence of the intentional and deliberate manner of killing: two neck stabs, with an implied interval to reflect, as well as the infliction of blunt force trauma in different areas of the victim's body].)

"[C]lustered stab wounds" may support an inference that the killing was deliberate. (*People v. Prince* (2007) 40 Cal.4th 1179, 1253 ["With regard to method, the clustered stab wounds support an inference of a deliberate killing"].)

Based on the foregoing, we conclude substantial evidence supports a finding that the "manner of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way." (*Anderson, supra*, 70 Cal.2d at p. 27.)

Employing the *Anderson* categories as a framework to evaluate the evidence of premeditation and deliberation, and viewing the evidence in the light most favorable to the prosecution, as we must, we conclude substantial evidence supports the jury's determination. There was substantial evidence of both planning and that the manner of the killing demonstrated premeditation and deliberation. As such, the evidence was legally sufficient to support the verdict.

In short, we cannot say that, " ' " 'upon *no hypothesis whatever* is there sufficient substantial evidence to support' " the jury's verdict.' " (*Penunuri, supra*, 5 Cal.5th at p. 142, italics added.)

DISPOSITION

The judgment is affirmed.

_____
HULL, J.

We concur:

_____
BLEASE, Acting P. J.

_____
HOCH, J.